NOTICE

Decision filed 11/22/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230513-U

NO. 5-23-0513

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* A.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-JA-107 |
| | ) | |
| Jeffery B., | ) | Honorable |
| | ) | Rodney S. Forbes, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1  *Held*:  Where the trial court's orders finding that Jeffery B. was an unfit parent and that the best interest of the minor child warranted termination of his parental rights were not contrary to the manifest weight of the evidence, we affirm the orders.

¶ 2  Jeffery B. (Jeffery) is the father of a boy, A.B. The Department of Children and Family Services (DCFS)[1] placed A.B. in foster care after his birth. At the time of A.B.'s birth, his mother had surrendered her parental rights to two other children, while Jeffery had pending cases to terminate his parental rights to two other children because he had completed no services. Due to

---

[1]DCFS utilized the services of a local service provider, Webster Cantrell Youth Advocacy, in this case. Although not interchangeable, throughout much of this order, we refer to both entities as DCFS.

1

Jeffery's failure to make reasonable efforts and progress towards the return of A.B. in this case, the State filed its motion to terminate his parental rights. After the trial court found that Jeffery was an unfit parent, the court concluded that it was in A.B.'s best interest to terminate his parental rights. He appeals from these orders.

¶ 3                                    I. BACKGROUND

¶ 4      A.B. was born on June 2, 2021. His father is Jeffery, and his mother is Debra H.[2] Debra H. previously surrendered her parental rights to two children with a different biological father. When A.B. was taken into protective custody, Jeffery had two pending petitions to terminate his parental rights to two other children, and he had an adult son who was reportedly a sex offender, although DCFS was uncertain if he lived with Jeffery.

¶ 5      On June 8, 2021, the State filed its petition alleging in count I that A.B. was neglected (705 ILCS 405/2-3(1)(b) (West 2020)) and in count II that A.B. was abused (*id.* § 2-3(2)(ii)). The trial court held the shelter care hearing on the same date, holding that probable cause existed for filing the petition because Jeffery had completed no services in two other DCFS cases and the State's motions to terminate his parental rights on those cases were set later in June 2021.[3] The court placed guardianship of A.B. with DCFS.

¶ 6      On June 30, 2021, the trial court held its adjudicatory hearing, after which it entered its order finding that A.B. was neglected in that he was in an environment injurious to his welfare. Jeffery stipulated to count I (neglect), and the court dismissed count II (abuse). The court granted temporary custody of A.B. to DCFS.

---

[2]Debra H. is not a party to this appeal. On November 9, 2022, Debra H. surrendered her parental rights to A.B.

[3]The record on appeal provides no further information on whether Jeffery's parental rights were terminated in these other two cases.

¶ 7   On July 12, 2021, DCFS filed a dispositional report with the court. Until the end of June 2021, DCFS had no contact information for Jeffery. Upon obtaining contact information, DCFS set up a family service plan. DCFS reported that Jeffery had been recommended for mental health counseling, having a psychiatric follow-up appointment for prescription modification, parenting classes, and supervised visitation with A.B. DCFS also required Jeffery to maintain stability. DCFS referred Jeffery to Webster Cantrell Youth Advocacy (WCYA) for parenting and counseling services, and planned to refer him to Primed for Life, Inc. for education on maintaining an appropriate home environment for A.B.

¶ 8   The trial court entered its dispositional order on July 28, 2021, finding that Jeffery was unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, educate, supervise, or discipline A.B., and placement of A.B. with Jeffery was contrary to A.B.'s health, safety, and best interest. The trial court adjudicated A.B. as neglected, made him a ward of the court, and placed custody and guardianship of A.B. with DCFS.

¶ 9   On January 13, 2022, DCFS filed its permanency review. The permanency goal was to return A.B. home within 12 months. DCFS reported that Jeffery had not engaged in mental health services and was discharged from the program for nonattendance. Jeffery was engaged in parenting classes. At a December 2021 meeting with Jeffery, he stated that he had been hospitalized for one month, which was the explanation for his lack of engagement in mental health services. A housing advocate had been assigned to Jeffery. Jeffery had engaged in visitation and was reported to have done well with A.B. DCFS recommended maintaining the permanency goal of returning A.B. home within 12 months.

¶ 10    The trial court entered its permanency order on January 26, 2022, concluding that Jeffery had not made reasonable efforts or reasonable and substantial progress toward returning A.B. home. Custody and guardianship of A.B. was maintained with DCFS.

¶ 11    On July 12, 2022, DCFS filed its next permanency review report. As of the date of the report, DCFS reported that Jeffery had almost completed his parenting classes and his instructor reported that he was doing well. Jeffery had still not begun mental health services. Jeffery had not wanted to start his counseling with a new counselor through WCYA and planned on returning to a counselor he had seen before at Heritage Behavioral Health Center (Heritage). However, he recently discovered that Heritage had a six- to seven-month wait list for appointments. DCFS put in a request at WCYA to get him set up for mental health services, and he was placed on the WCYA wait list. DCFS reported that while Jeffery was visiting A.B., scheduling his visits was difficult because Jeffery was a full-time student. Thus, his visits had to be worked into his schedule. Jeffery did well during these supervised visits. Jeffery still had not located appropriate housing with the assistance of his housing advocate.

¶ 12    On July 27, 2022, the trial court entered its permanency order maintaining the goal of returning A.B. home to Jeffery within 12 months, noting that Jeffery was engaged in services. The court found that Jeffery had made reasonable efforts, but not reasonable and substantial progress toward bringing A.B. home.

¶ 13    DCFS filed the next permanency review report on January 12, 2023. Jeffery still had not begun mental health counseling. He had an appointment at WCYA in December 2022 but did not show or cancel that appointment. Jeffery moved into a new home in December. Since the last court hearing, Jeffery cancelled numerous visits with A.B. While DCFS had the discretion to allow Jeffery to begin weekend and/or overnight visitation with A.B., DCFS was delaying those

4

opportunities until Jeffery began mental health counseling. Jeffery was currently employed full-time at Menards. DCFS indicated that it was too early to recommend returning A.B. to Jeffery, stating that it wanted to see if he would engage in mental health counseling. DCFS stated that if Jeffery did not complete those services and become more cooperative with visitation, "the agency will take the case to legal screening to pursue termination of parental rights."

¶ 14 On January 25, 2023, the trial court entered its permanency order maintaining the permanency goal of returning A.B. home within 12 months. The court found that Jeffery had made reasonable efforts but not reasonable and substantial progress toward the permanency goal. DCFS retained custody and guardianship.

¶ 15 On April 3, 2023, DCFS filed its permanency review report. Jeffery had begun mental health counseling, but the DCFS worker expressed concerns with Jeffery's mental status. Apparently, Jeffery had several verbal altercations with DCFS staff "when he doesn't get his way." Jeffery remained inconsistent with his supervised visits, and as a result, DCFS suspended his visits in March. At a March 20, 2023, DCFS meeting, Jeffery made multiple "concerning" statements. At issue was a visit that Jeffery cancelled after being contacted by the case aide that due to A.B. soiling his diaper, she was going to be 5 to 10 minutes late to arrive for the visit. At the DCFS meeting, Jeffery argued that DCFS needed to be on time "and if that requires driving A[.B.] across town in a dirty diaper, then that is what [DCFS] needs to do." DCFS also noted that on a visit planned for early April 2023, the foster parent reported that the family, including A.B., was in quarantine because she had tested positive for COVID-19. Angered by his visit being cancelled, Jeffery contacted his DCFS worker at midnight demanding that the foster parent provide medical records confirming that she had COVID-19. DCFS stated its overall concern with these incidents which the agency believed established "a clear pattern that [Jeffery] is more concerned with

5

himself than the well-being of his child." DCFS concluded its report requesting that the trial court modify the permanency goal to substitute care pending the court's determination on termination of Jeffery's parental rights.

¶ 16    On April 11, 2023, the State filed its motion to terminate Jeffery's parental rights. The State alleged that Jeffery was an unfit parent on the following five bases: (1) Jeffery failed to maintain a reasonable degree of interest, concern, or responsibility about A.B.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) Jeffery failed to make reasonable efforts to correct the conditions that were the basis for the removal of A.B. during any nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(i)); (3) Jeffery failed to make reasonable progress toward the return of A.B. during the specific nine-month period following the adjudication of neglect— July 1, 2021, to April 1, 2022 (*id.* § 1(D)(m)(ii)); (4) Jeffery failed to make reasonable progress toward the return of A.B. during the specific nine-month period following the adjudication of neglect—April 2, 2022, to January 1, 2023 (*id.*); and (5) Jeffery failed to make reasonable progress toward the return of A.B. during the specific nine-month period following the adjudication of neglect—July 12, 2022, to April 12, 2023 (*id.*).

¶ 17    The fitness hearing was held on May 18, 2023. The State called one witness, Matthew Stymets, Jeffery's foster care caseworker with WCYA. The defendant testified on his own behalf.

¶ 18    Matthew Stymets testified that he has been employed with WCYA since 2019. He was assigned to this case shortly after A.B.'s birth in June 2021. He stated that A.B. came into care as an add-on case for another of his cases involving A.B.'s mother, Debra H. Stymets stated that Jeffery was required to complete a mental health and parenting assessment, and to participate in supervised visitation.

¶ 19    Stymets testified that Jeffery completed his parenting evaluation in 2021, and then began his 32-week parenting class. The classes were held weekly, but Jeffery did not complete the program until November 3, 2022. Jeffery missed multiple classes for unstated reasons, and at one point was hospitalized for three weeks. Other classes were cancelled due to agency staffing shortages. DCFS rated Jeffery as satisfactory in parenting classes because he was attending more classes than he was missing from July 2021 to April 2022 and from April 2022 to January 2023. Stymets testified that he was hesitant to rate Jeffery satisfactory on the latter time frame due to the number of classes he missed.

¶ 20    Stymets testified that Jeffery completed his mental health assessment in August 2021. The counselor recommended one-on-one counseling. However, Jeffery did not begin counseling until February 2023. Stymets and his supervisor met with Jeffery to encourage his participation because he was not engaging in counseling services. At that point, Jeffery opted to attempt to return to his previous counselor at Heritage. However, Stymets testified to what he described as a "months long process" to get him to be assessed at Heritage and engage in counseling. Jeffery provided multiple excuses for not advancing this objective. Stymets stated that Jeffery did not engage in mental health counseling until February 2023 after DCFS retransferred his referral from Heritage back to WCYA due to Heritage's lengthy wait list. Between July 2021 and April 2022, and then between April 2022 and January 2023, DCFS rated Jeffery unsatisfactory on his mental health services objectives.

¶ 21    Stymets testified that Jeffery engaged in supervised visitation, but never advanced to unsupervised weekends and overnight visitation. Between July 2021 and April 2022, Jeffery's visitation attendance was very sporadic. Stymets clarified that between July 2021 and September 2021, Jeffery was fairly consistent, but for the remainder of that nine-month period he was inconsistent with cancellations and no-shows. Twice, during this case, DCFS put supervised visits

7

between Jeffery and A.B. on hold for nonattendance issues. When visitation is put on hold, DCFS invites the parent to a meeting to discuss what barriers are holding back participation in visitation. Both times, Jeffery indicated that his work schedule was the problem. Stymets testified that Jeffery simply would not provide DCFS with his work schedule, which would have helped with planning Jeffery's visits around his work schedule. Stymets also testified about the incident when Jeffery cancelled the visit because the session would start 5 to 10 minutes late to allow for A.B.'s diaper to be changed. Stymets testified that Jeffery stated that "they were on his time," and then cancelled the visit. Jeffery also seemed to lack understanding of A.B.'s developmental age in that he had recently brought age-inappropriate food and drink for A.B. These "inappropriate" encounters suggested to Stymets that Jeffery was not able to apply what he should have "learned" in parenting classes about child development. Stymets also testified that he had recently set up a home check with Jeffery to ascertain if his new home was appropriate for supervised visits. Stymets was struggling to find the home based upon the address information, and when he contacted Jeffery for directions, Jeffery told him to "forget about it," because he was not then at the home.

¶ 22 Overall, Stymets testified that the agency and its case aides had difficulty with Jeffery in terms of his attitude. If a supervised visit was cancelled due to illness or other reasons, Jeffery would angrily text agency employees about his visitation rights. He also testified about the recent incident when the foster parent tested positive for COVID-19 and Jeffery demanded medical documentation as proof.

¶ 23 On cross-examination, Stymets reviewed the mental health counselor's notes in which she indicated that Jeffery was "progressing and managing tools to offset passive aggressive disposition toward potentially angering in situations, making progress and accepting and coping with slow progress and negotiating social/authoritative systems, learning and utilizing distress tolerance

8

tools." Stymets testified that he did consider this as evidence of Jeffery's progress in his mental health plan objective but noted that he also considered the number of "no call" or "no show" cancelled counseling appointments as a bad sign given the fact that Jeffery began mental health counseling only three months earlier.

¶ 24 Jeffery testified that his issues with visitation involved his ever-changing work schedule at Menards. Contradicting Stymets' testimony, he stated that he did provide his work schedules to DCFS. Subsequently, he was let go by Menards and went to work at an Arby's restaurant. As of the date of his testimony, Jeffery was working with a "new company." Jeffery testified about the process in getting his new house. His housing advocate told him that she had notified Stymets that Jeffery was ready for a home visit. Jeffery denied receiving any contact from Stymets about a home visit and stated that he made numerous requests for Stymets to complete the home visit. Then, Jeffery acknowledged that Stymets attempted to make a home visit, but he was either working or was not at home at that time. He testified that his new house was safe and secure for A.B. Jeffery testified that the case aide cancelled one of his supervised visits because he was running late, but he complained that DCFS was frequently late at bringing A.B. to his visits, and he was required to accept DCFS's tardiness. Jeffery testified that he had a bond with A.B. and that A.B. was happy when he got to visit with him.

¶ 25 On cross-examination, Jeffery was asked about the passage of time from August 2021 when he had his mental health assessment with Heritage until mid-June or July 2022 when he sought an appointment at Heritage and learned of the lengthy wait list. He testified that he was busy working and going to school at Richland Community College, and he had little free time. He then indicated that he had been attempting to obtain an appointment, but that Heritage had no

appointments available. Then when he returned to WCYA for mental health counseling, the delay in getting started was due to a lack of transportation.

¶ 26    At the conclusion of the fitness hearing, the trial court made its rulings on the record, concluding that the evidence supported a finding that Jeffery was an unfit parent. The court found that the State had established by clear and convincing evidence that Jeffery had failed to maintain a reasonable degree of interest, concern, or responsibility for A.B. because of his lack of engagement in parenting services. 750 ILCS 50/1(D)(b) (West 2022). The court noted that parenting classes could have been completed in approximately 8 months, but that Jeffery needed 15 months to complete the course. The court also found support for its finding in that Jeffery did not engage in mental health counseling until February 2023, after being initially assessed in August 2021 and recommended for services. The court noted that since February 2023, Jeffery had already missed three counseling sessions. The trial court found support for its finding that Jeffery failed to maintain a reasonable degree of interest, concern, or responsibility for A.B., in his absence from one-third of his scheduled supervised visits. Finally, the court found that there had been no evidence that Jeffery had provided any financial support for A.B.

¶ 27    The trial court also concluded that Jeffery had not shown reasonable efforts during any nine-month period. *Id.* § 1(D)(m)(i). The court pointed to the extreme delay in starting mental health counseling and the delayed completion of his parenting classes as supportive of that finding.

¶ 28    For the same reasons, the trial court found that the State had proven its allegations that Jeffery had not made reasonable and substantial progress toward his service plan objectives during the three nine-month periods alleged by the State. *Id.* § 1(D)(m)(ii).

¶ 29    On June 14, 2023, DCFS filed its best interest report with the trial court. A.B. was in a fictive kin placement along with his maternal half-brother. The foster parent was adopting A.B.'s brother and had indicated her willingness to adopt A.B. as well.

¶ 30    The best interest hearing was held on July 6, 2023. The State called WCYA foster care caseworker, Matthew Stymets, and Jeffery testified on his own behalf.

¶ 31    Stymets testified that he had been A.B.'s caseworker since he was born two years before. A.B. had been in the same foster placement with his older half-brother, who was four years old. Stymets testified that the brothers were extremely bonded. The boys played with each other, and the older boy referred to A.B. as his brother. A.B.'s foster parent had a dedicated babysitter who stayed with the boys when she was at work. A.B.'s medical needs were being met. He was currently enrolled in early intervention services for speech therapy and motor skills. A.B.'s physician arranged for these early intervention services in coordination with WCYA. Stymets stated that the foster parent was committed to getting A.B. this extra help. A.B. was bonded with his foster mother, and he showed love and affection to her. Stymets recommended the termination of Jeffery's parental rights, noting that the only home A.B. has lived in since birth is his current foster placement.

¶ 32    On cross-examination Stymets acknowledged that he had never been to Jeffery's home to determine if it is appropriate for A.B. He explained that the foster placement was fictive kin in that the foster mother was a friend of the biological father of A.B.'s older brother. A.B.'s older brother had lived in this foster setting since his birth. After A.B. was born, DCFS reached out to this foster parent because of the familial relationship between A.B. and his older brother.

¶ 33    Jeffery testified at the best interest hearing. Since A.B. was born, Jeffery estimated that he had visited with him approximately 40 to 42 times. A.B. was always happy and interacted well

11

with him. He testified that for the last three months he had been employed at a metal fabricating facility. He stated that his home was appropriate for A.B., and that he would have a babysitter watch A.B. while he worked if the trial court would return A.B. to him. Jeffery testified that he did not believe it was in A.B.'s best interest to terminate his parental rights. He stated that A.B. was taken into DCFS custody because of issues with A.B.'s mother, and he believed that the issues she had with her ex-boyfriend were somehow impacting his own case.

¶ 34    At the conclusion of the best interest hearing, the trial court entered its ruling. The court noted that it found the testimony of Stymets and Jeffery to be credible. The court stated that it must consider the statutory best interest factors. The court found that the most important best interest factors were the physical safety and welfare of A.B., including food, shelter, clothing, and health. A.B. had lived in the same foster placement for more than two years. The court found that all of A.B.'s needs were being met. The development of A.B.'s identity favored termination. The court noted that A.B. showed love towards his foster parent, and she returned her love to A.B. A.B. shared his home with his half-brother, who referred to A.B. as his brother. The trial court found that A.B.'s background and ties, his sense of attachment, including where he feels love, and a sense of being valued, his sense of security and familiarity all favor termination. The court also found that this foster setting was the least disruptive placement alternative for A.B. Overall, focusing on A.B.'s need for permanency, stability, and continuity of relationships with parental figures and his sibling, the trial court found that the State established that A.B.'s best interest required termination of Jeffery's parental rights by a preponderance of the evidence.

¶ 35                                    II. ANALYSIS

¶ 36    Jeffery appeals from the trial court's orders finding that he was an unfit parent and terminating his parental rights.

¶ 37    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)) provide the legal authority for the involuntary termination of parental rights in Illinois. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d 329, 337 (2010)). Section 2-29 of the Juvenile Court Act of 1987 provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The process mandated involves two hearings. In the first hearing, the State must prove by clear and convincing evidence that the parent is an "unfit person" as defined by the Adoption Act. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994)); 750 ILCS 50/1(D) (West 2020). If the trial court finds that the parent is unfit, the case proceeds to a second hearing where the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d at 337-38); 705 ILCS 405/2-29(2) (West 2020).

¶ 38    When a parent appeals the trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the appellate court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill. 2d 92, 104 (2008)). The reviewing court gives great deference to the trial court's finding of unfitness because the court had the best opportunity to view and evaluate the parties and their testimony. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). Therefore, we do not reweigh the evidence or reassess the credibility of the witnesses on appeal. *Id.* (citing *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001)). "A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.* (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

13

¶ 39                                        A. Fitness

¶ 40    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Jeffery was an "unfit person." The trial court determined that the State met its burden of proof on the following bases: (1) that Jeffery failed to maintain a reasonable degree of interest, concern, or responsibility as to A.B.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) that Jeffery failed to make reasonable efforts to correct the conditions that were the basis for A.B.'s removal during any nine-month period after the adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) that Jeffery failed to make reasonable progress toward A.B.'s return within three specific nine-month periods following the adjudication of neglect—(a) July 1, 2021, to April 1, 2022, (b) April 2, 2022, to January 1, 2023, and (c) July 12, 2022, to April 12, 2023 (*id.* § 1(D)(b)(ii)).

¶ 41    Jeffery argues that the trial court erred in finding that he was an unfit parent because he had completed parenting classes, was engaged in mental health services, and attended his supervised visits with A.B.

¶ 42                    1. *Reasonable Degree of Interest, Concern, or Responsibility*

¶ 43    The language used by our legislature in section 1(D)(b) of the Adoption Act is in the disjunctive, meaning that any one of the three separate segments—interest or concern or responsibility—"may be considered by itself as a basis for unfitness." *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31 (citing 750 ILCS 50/1(D)(b) (West 2012); *In re Richard H.*, 376 Ill. App. 3d 162, 166 (2007)). To determine if a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, the court "considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare." *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). The court can also consider evidence that the parent

14

completed his or her service plan as establishing the parent's interest, concern, or responsibility. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1065). A parent's effort is more important than a parent's success with the service plan objectives. *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990)). "In this regard, the court examines the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d at 278). Circumstances of the parent's difficulties in completion of plan objectives and/or in attending visitation, including transportation issues and poverty, are relevant in assessing the reasonable degree of a parent's interest, concern, or responsibility for the minor's welfare. *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d at 278-79). "We are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child." *Id.* (citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Instead, the court must objectively assess whether the interest, concern, or responsibility is reasonable. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064).

¶ 44     Here, the trial court concluded that Jeffery did not establish a reasonable degree of interest, concern, or responsibility toward A.B.'s return. This case began when DCFS took custody of A.B. directly from the hospital after his birth because of issues involving previous DCFS cases with A.B.'s mother and Jeffery's son who is a registered sex offender and who may have been living with Jeffery. DCFS had required Jeffery to engage and advance in mental health counseling and parenting classes and to participate in supervised visitation with A.B.

¶ 45     Jeffery completed parenting classes although completion took much longer due to his inconsistent attendance. However, despite completion of the parenting classes, aides who supervised Jeffery's recent visits noted that he brought age-inappropriate food and drink for A.B.

15

¶ 46    DCFS also referred Jeffery for mental health counseling sessions. He had his assessment for services in August 2021, but he did not actually begin counseling sessions until February 2023 and he missed three sessions soon after he began counseling.

¶ 47    Jeffery participated in his supervised visits with A.B. and there was no question that he loved A.B. However, Jeffery's attendance at supervised visits was inconsistent. Moreover, because Jeffery did not immediately begin working on his mental health counseling service plan objective, DCFS was wary about allowing Jeffery to advance to unsupervised or overnight visits with A.B.

¶ 48    We must give great deference to the trial court's finding of unfitness as the court was able to evaluate the demeanor and testimony of Jeffery and WCYA foster care caseworker Matthew Stymets. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). Overall, we agree with the trial court's findings that Jeffery failed to maintain a reasonable degree of interest, concern, and/or responsibility for A.B. as evidenced by his failure to start mental health counseling until 18 months after his initial assessment, his failure to learn and utilize the parenting education he received in classes, and his sporadic attendance at visitation. We find that the trial court's finding is not contrary to the manifest weight of the evidence. *In re M.I.*, 2016 IL 120232, ¶ 21; *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill. 2d at 104).

¶ 49                    2. *Reasonable Effort Within Any Nine-Month Period*

¶ 50    "Reasonable effort" is determined by a subjective standard that refers to the amount of effort which is reasonable for that parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67. The court must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. "A parent's deficiencies collateral to the conditions that were the basis for the

removal of the children are not relevant to the reasonable efforts analysis." *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002).

¶ 51    Jeffery argues that the trial court's finding that he was unfit for failure to make reasonable efforts to correct the conditions that brought A.B. into DCFS custody was contrary to the manifest weight of the evidence. A.B. was taken into DCFS custody at birth because of issues in DCFS cases involving other children fathered by Jeffery. DCFS determined that Jeffery needed to participate and engage in parenting classes and engage in mental health counseling. Both service plan objectives were designed to ensure that A.B. would be safe and secure if custody and guardianship were placed with Jeffery. Unfortunately, Jeffery did not successfully complete mental health counseling and failed to fully understand and/or apply parenting skills he was taught in classes, and thus did not make "a committed and diligent effort" to correct the underlying conditions that brought A.B. into the custody and guardianship of DCFS. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. We find that the trial court's order finding that Jeffery failed to show a reasonable effort toward correcting these conditions is not contrary to the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

¶ 52                  3. *Reasonable Progress Within a Nine-Month Period*

¶ 53    The term "reasonable progress" requires an objective determination regarding the amount of progress based upon the conditions existing at the time the minor child's custody was removed from the parent. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47 (citing *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

> " 'The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of
>
> the Adoption Act encompasses the parent's compliance with the service plans and court's

17

directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent.' " *Id*. (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17). "A parent makes reasonable progress when the trial court can find that the progress 'is sufficiently demonstrable and of such a quality' that the trial court may soon be able to order the return of the minor to the parent's custody." *Id.* (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

¶ 54 Here, the trial court found that Jeffery failed to make reasonable efforts during any nine-month period following the court's adjudication of neglect. More specifically, the court separately concluded that Jeffery failed to make reasonable progress during three specific nine-month periods—July 1, 2021, to April 1, 2022, April 2, 2022, to January 1, 2023, and July 12, 2022, to April 12, 2023.

¶ 55 During the approximate two years that Jeffery's DCFS case was open, he was unsuccessful in his mental health counseling service plan objective. Moreover, he was not able to apply the developmental information he was taught in parenting classes during his most recent supervised visits, which fell into the third nine-month period. Overall, Jeffery's progress was marred by his lack of consistency and planning. His attendance in parenting classes, mental health appointments, and supervised visits with A.B. was poor. In addition, his combative attitude toward DCFS workers was concerning. We agree with the trial court's finding that Jeffery failed to make reasonable progress to correct the conditions that were the basis for the removal of A.B. during the three specified nine-month periods.

¶ 56                                  4. *Finding That Jeffery Was Unfit*

¶ 57 Having determined that Jeffery failed to show a reasonable degree of responsibility, failed to show a reasonable effort on his service plan objectives during any nine-month period, and failed

18

to show reasonable progress on his service plan objectives during three specific nine-month periods, we conclude that the trial court's order finding that Jeffery was an unfit parent is not contrary to the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d at 828).

¶ 58                                                B. Best Interest

¶ 59    Termination of a parent's rights is a difficult and final step. *In re Adoption of Syck*, 138 Ill. 2d at 274-75. Parents maintain the important right to raise their own children. *Id.* However, when a parent has been declared "unfit," "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d at 337-38. The interests of the parent and the child remain concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship' " until the court declares that the parent is unfit. *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)).

¶ 60    At the best interest hearing, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d at 366. We review the trial court's best-interest decision with the manifest weight of the evidence standard. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072. On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court was in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

19

¶ 61     "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must analyze several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2020). Those factors include:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.* The trial court is not required to make an explicit finding on each of the best interest factors. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 33 (citing *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19); *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 (citing *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991)). Another factor the trial court may consider is the likelihood of adoption. *In re Tashika F.*, 333 Ill. App. 3d at 170.

¶ 62    During the best interest hearing, Jeffery testified that he was employed, had a safe house, and was able to provide A.B. with the stability he needed. He stated that he did not believe that the court should terminate his parental rights. We do not have reason to doubt this testimony. However, the trial court found that A.B.'s current fictive kin foster home provided a more permanent and appropriate placement, and that the foster parents were willing to adopt him.

¶ 63    The trial court was most concerned with A.B.'s physical safety, welfare, and placement stability. Since birth, A.B. had only lived in his foster home. His half-brother was in this same foster home and was in the process of being adopted by the foster parent, who also expressed her willingness to adopt A.B. The court noted that A.B. was bonded with his foster parent. A.B.'s sense of identity, familiarity, attachment, security, and continuity of relationships favored termination. The court commented that this foster placement was the least disruptive for A.B., who had familial ties that would be continued.

¶ 64    Here, the record clearly establishes that termination of Jeffery's parental rights was the appropriate outcome for A.B. under all the circumstances. We conclude that the trial court's decision to terminate Jeffery's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 65                                    III. CONCLUSION

¶ 66     For the foregoing reasons, we affirm the judgments of the circuit court of Macon County

finding that Jeffery was an unfit parent, and that the best interest of A.B. required the termination

of his parental rights.


¶ 67     Affirmed.